592 F.2d 617
 Fed. Sec. L. Rep. P 96,404
Edward S. REDINGTON, as Trustee for the liquidation of the
business of Weis Securities, Inc., and Securities
Investor Protection Corporation,
Plaintiffs- Appellants,
v.
TOUCHE ROSS & CO., Defendant-Appellee.
 Nos. 136, 144, Dockets 77-7183, 77-7186.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 14, 1977.
Decided April 21, 1978.
Certiorari Granted Nov. 27, 1978. See 99 S.Ct. 563.
 
 James B. Kobak, Jr., New York City (Hughes Hubbard & Reed, John S. Allee, John W. Schwartz and Harold L. Kaplan, New York City, on the brief), for plaintiff-appellant Edward S. Redington, as Trustee for the liquidation of the business Weis Securities, Inc.
 Clarence Fried, New York City (Hawkins, Delafield & Wood, Philip R. Forlenza and Rafael Pastor, New York City, on the brief), for plaintiff-appellant Securities Investor Protection Corp.
 Arnold I. Roth, New York City (Rosenman, Colin, Freund, Lewis & Cohen, Eugene Zemp DuBose, Jr. and Arthur S. Linker, New York City, on the brief), for defendant-appellee.
 Paul Gonson, Associate Gen. Counsel, James H. Schropp, Asst. Gen. Counsel, S. E. C., Washington, D.C.; Theodore S. Bloch, Gen. Counsel, SIPC, Washington, D.C., on the brief, amicus curiae.
 Before LUMBARD, MULLIGAN and TIMBERS, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 In this appeal, rising out of the insolvency and liquidation of the brokerage firm of Weis Securities, Inc. ("Weis"), we are presented with the question whether a private cause of action exists under section 17 of the Securities Exchange Act of 1934[1] against accountants who prepare misleading statements of a broker's financial affairs, and if so, who may maintain such an action.
 
 
 2
 The district court dismissed the claims herein of the Securities Investor Protection Corp. ("SIPC")[2] and of Edward S. Redington, Weis' Trustee in Liquidation ("Trustee"), believing that no claim for relief was stated because no cause of action could be implied from section 17.[3] Redington v. Touche Ross & Co., 428 F.Supp. 483 (S.D.N.Y.1977). We conclude that customers of a broker have a right of action against an accountant whose audits of the brokerage firm are false or misleading. Because we believe that SIPC and the Trustee are appropriate parties to seek (between them) total recovery of the customers' damages, we reverse and remand.
 
 
 3
 * Touche Ross & Co. ("Touche Ross") served as Weis' independent certified public accounting firm from 1969 to 1973. In that capacity, Touche Ross prepared annual audits of Weis' affairs as required by section 17 and regulations thereunder.
 
 
 4
 The complaint herein alleged that during fiscal 1972, certain of Weis' officers conceived and executed a scheme to conceal from the regulatory authorities and the public Weis' dire financial condition.[4] The elements of this scheme appear in great detail in the complaint; for example, although Weis had suffered a loss for fiscal 1972 of greater than $1.5 million, its pre-tax earnings for that year were stated as being around $1.7 million.
 
 
 5
 When Weis' fiscal 1972 ended on May 26, 1972, Touche Ross proceeded to prepare and certify Weis' financial statements, and to answer the financial questionnaire required by the New York Stock Exchange of its member firms. In four opinion letters, dated July 7, July 7, July 21 and July 21 (all of 1972), Touche Ross represented that it had examined (i) the statement of Weis' current financial condition; (ii) Weis' answers to the financial questionnaire; (iii) Weis' consolidated balance sheet for the past year; and (iv) Weis' consolidated statement of earnings for the past five years, and found that each presented fairly and accurately the financial picture of Weis, in conformity with generally accepted accounting procedures.
 
 
 6
 In fact, Weis' financial condition was not as stated in the above four documents, but was far more precarious. As no steps were taken to attempt to remedy Weis' situation, it continued to deteriorate.[5] On May 24, 1973, the SEC sought an injunction preventing Weis and its officers from continuing to violate the '34 Act, and SIPC applied for a decree, pursuant to 15 U.S.C. § 78eee(a)(2), adjudging Weis' customers in need of protection under SIPA. Accordingly, Weis' liquidation was ordered by (then) District Judge Gurfein on May 30, 1973, and Edward Redington was appointed Trustee for the liquidation.
 
 
 7
 SIPC and the Trustee jointly began an action against Touche Ross in New York state court on July 3, 1975. Redington v. Touche Ross & Co., No. 1399 6/76 (Sup.Ct.N.Y.County). The common allegations of the plaintiffs in the state court complaint were the same as those in the instant case, except that three paragraphs dealing with claims under section 17 of the '34 Act were omitted. Five of the Trustee's six present "causes of action" appear in identical form in the state action, as do four of SIPC's eight present claims. The additional claims in this action are the federal securities law claims.
 
 
 8
 The instant suit was commenced on April 30, 1976. Under federal law and state common law, SIPC seeks to recover $14 million, either as subrogee of Weis' customers whose claims it has paid under SIPA, or as a member of the group directly injured by Touche Ross' delicts. Likewise under federal law and state common law, the Trustee is claiming $51 million; he contends that he may recover either by standing in the shoes of Weis' customers, since under SIPA, his is the responsibility to marshal and return their property,[6] or by standing in the shoes of Weis itself, since, he alleges, Weis as an entity distinct from its conniving officers was directly damaged by Touche Ross' unsatisfactory audit.
 
 
 9
 SIPC and the Trustee appeal from Judge Wyatt's order dismissing the complaint for failure to state a claim on which relief could be granted (with respect to the section 17 counts). Touche Ross asks us, in the event we reverse, to stay the federal action in favor of the state court suit.[7] This last issue, evidently, is one which Judge Wyatt has never had cause to consider.
 
 II
 
 10
 The first question we address is whether customers of a brokerage firm are given any remedy by the '34 Act against accountants whose section 17 reports are false or misleading. There are two major considerations involved in this decision: the criteria laid down by the Supreme Court in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), for finding an implied right of action in a statute which is silent on the issue; and the "purchase or sale" requirement reaffirmed by the Court in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).
 
 
 11
 One preliminary matter must be dealt with. Judge Wyatt held that section 17 "was designed to supply administrative guidance in the bookkeeping area and not to create rights in anybody," and that it "does not impose any duty on accountants." 428 F.Supp. at 489, 491. We believe that, even if no right of action were implied, to see nothing but "administrative guidance" in a provision as crucial to the regulation of brokers as section 17 is to take far too narrow a view of the statute. Certified public accountants play a significant role in the scheme created by the '34 Act for the regulation of securities trading, as is recognized by the regulations promulgated by the SEC.[8] See, e. g., 17 C.F.R. § 240.17a-5(b), (f), (g), (h), (i), (m). It is well established that section 10(b) of the '34 Act and rule 10b-5 thereunder impose a duty on accountants, for breach of which they may be sued. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). We hold that section 17 of the '34 Act likewise imposes a duty on accountants.
 
 
 12
 * The factors cited in Cort v. Ash, supra, 422 U.S. at 78, 95 S.Ct. 2080, familiar through much repetition, which bear on the propriety of finding an implied right of action in a statute are:
 
 
 13
 1) Whether plaintiffs belong to the class for whose special benefit the statute was enacted;
 
 
 14
 2) Whether there is any indication of legislative intent on the issue;
 
 
 15
 3) Whether implication of a right of action is consistent with the policies behind the legislative scheme; and
 
 
 16
 4) Whether the cause of action in question is one traditionally relegated to state law.
 
 
 17
 A consideration of these four factors convinces us that implication of a right of action in favor of Weis' customers is appropriate.
 
 
 18
 1. The language of section 17, the SEC rules in the 17a-5 series, and an analysis of the role played by accountants' reports in the regulation of brokers make clear the extent to which Weis' customers are members of a class peculiarly protected by section 17.
 
 
 19
 The documents and reports that the SEC is empowered to require of brokers must be "necessary or appropriate in the public interest Or for the protection of investors." 15 U.S.C. § 78q(a) (emphasis added). The same is true of the examinations that the SEC is empowered to conduct. Id.[9]
 
 
 20
 In order to provide a complete and accurate picture of a broker's financial condition, the SEC requires that the broker enlist an independent accountant to audit and certify its statements, list any matters to which the accountant takes exception, and provide certain additional financial data. Rule 17a-5(b), (i), (k). Furthermore, a notice of any "material inadequacies" found by the accountant in the broker's procedures must be sent to the broker's customers. Rule 17a-5(m)(3).[10]
 
 
 21
 The function of this arsenal of financial reports is to protect the broker's customers. One of the main methods adopted by the SEC to shield customers is the net capital rule, in either the form promulgated by the SEC, rule 15c3-1, or the stricter version enforced by the New York Stock Exchange, Exchange Rule 325.
 
 
 22
 The net capital rule is a requirement that a broker maintain a certain minimum ratio of liquid assets to aggregate indebtedness; its "principal purpose . . . is to require that the capital position of a broker . . . will always be sufficiently liquid to cover his current indebtedness, in order to be able at all times to promptly meet (sic) the demands of customers." Exchange Act Release No. 8024, 6 Fed.Sec.L.Rep. (CCH) P 72,129 (1967). As amended in order to take into account the creation of SIPC, the rule serves particularly to "protect customers prior to the time when the broker's . . . assets would be sufficient to satisfy customers in the event of liquidation." Exchange Act Release No. 11,497, (1975-76 Transfer Binder) Fed.Sec.L.Rep. (CCH) P 80,212.
 
 
 23
 It is the reporting system created by section 17 that provides the SEC and other regulatory authorities with the information needed to enforce the net capital rule. Thus, a failure to supply accurate reports will leave the customers without protection until the broker's insolvency can no longer be concealed, and liquidation follows.
 
 
 24
 2. We find no indication, either in the statute itself or in its legislative history, of any congressional intent either to create a private remedy under section 17 or to deny one.[11]
 
 
 25
 The legislative history of the section is mute on the issue, leading to the conclusion that Congress never Explicitly considered the question. Nor can it be said that Congress Implicitly chose to deny a private right of action; section 17 is distinctly different in an important respect from statutes as to which such implicit intent has been found.
 
 
 26
 In SIPC v. Barbour, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975), the Supreme Court noted that SIPA manifested a specific legislative intent to restrict enforcement to the SEC. Id. at 420, 425. In National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974), a similar exclusivity was found to rest with the Attorney General; in Cort v. Ash itself, Supra, 422 U.S. at 74-76, 95 S.Ct. 2080, the Federal Election Commission was held to be the agency charged with exclusive enforcement.
 
 
 27
 We have recently indicated that an intent to commit enforcement of the securities statutes exclusively to the SEC will not readily be implied. Abrahamson v. Fleschner, 568 F.2d 862, 874 n. 19 (2d Cir. 1977). Nothing in section 17 induces us to treat it as an exception to this rule.
 
 
 28
 3. "Absent specific statements of legislative intent, we must examine the legislative purposes underlying the Act." Abrahamson v. Fleschner, supra, 568 F.2d at 874, conclude that a private right of action under section 17 is consistent with those purposes.
 
 
 29
 A partial list of the many sections of the securities acts under which private remedies have been implied appears in Franklin National Bank v. L. B. Meadows & Co., 318 F.Supp. 1339, 1341-42 (E.D.N.Y.1970). See III L. Loss, Securities Regulation 1785 (2d ed. 1961). At least since J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (section 14(a)), it has been accepted in securities law that when a statutory provision imposes a duty on someone in favor of a class of protected persons, those persons may sue for the 'statutory tort' committed when the duty is breached.
 
 
 30
 We have held that section 17 imposes a duty on accountants in favor of brokers' customers. We note that just as in Borak the SEC was not meant to, and does not have the resources to examine and audit all the documents that it receives (in Borak, proxy statements; here, section 17 reports).[12] Both it and SIPC, as well as the broker's customers, must rely on the certification by the accountants.
 
 
 31
 Neither SEC injunctive actions nor criminal prosecutions will restore to customers the money they have lost. Indeed, the cases cited by Judge Wyatt in support of the proposition that there exists injunctive and criminal relief for violations of section 17 do not involve accountants. See 428 F.Supp. at 490, and cases cited. Accordingly, we rule that a private remedy is an essential supplement to the scheme of enforcement of section 17.
 
 
 32
 4. Finally, it is evident that just as the problems caused by insolvent brokers are national in scope, so must be the standards governing their reporting. Section 17 is part of a statute as to which federal courts have exclusive jurisdiction; state law protection of brokers' customers varies widely. There is no reason to believe that the remedy sought herein is one traditionally relegated to state law.
 
 B
 
 33
 The court below found a particularly high barrier to plaintiffs in section 18 and the judicially created purchaser-seller doctrine. 428 F.Supp. at 489-90. Section 18 creates private remedy for "misleading statements" in " any application, report, or document filed pursuant to this chapter," in favor of "any person . . . who . . . shall have purchased or sold a security at a price which was affected by such statement . . . ." 15 U.S.C. § 78r.
 
 
 34
 Applying this language, and the holding of Blue Chip Stamps, supra, 421 U.S. at 736, 95 S.Ct. 1917, Judge Wyatt ruled that the remedy provided by section 18 was exclusive, and that thus no remedy existed for brokers' customers injured as a result of an accountant's misleading statements, absent a purchase or sale of an affected security. We disagree.
 
 
 35
 Since any misstatement in a section 17 report would not affect the price of the shares of the various issuers in the hands of a broker's customers, a strict application of section 18's limiting language would leave customers without any remedy whatsoever, no matter how egregious the fraud or how grievous their loss. Yet it is plain that brokers' customers are favored wards of section 17. We cannot agree that Congress simultaneously sought to protect a class and deprived the class of the means of protection.
 
 
 36
 Our holding is not inconsistent with either the purchaser-seller limitation or section 18, which will continue to apply to all investors in market securities who seek relief Qua investors. That is, the Blue Chip doctrine would bar a suit by an investor who claimed to have been induced Not to purchase or sell by a misstatement. We do not believe, however, that the doctrine applies to brokers' customers, protection of whom is wholly independent of protection of investors per se.
 
 III
 
 37
 In light of the foregoing analysis, we decide that brokers' customers have a right of action against accountants for certifications that violate the standard set by section 17 and rule 17a-5. This does not, however, resolve the question whether the plaintiffs in the instant case, SIPC and the Trustee, are proper parties to bring the action.
 
 
 38
 * SIPC asserts a right to bring this action both in its own right and as subrogee of the customers whose claims it has paid. We hold that SIPC may maintain the action as subrogee.[13]
 
 
 39
 SIPA provides expressly that SIPC, upon reimbursing a customer's losses, shall be subrogated to that customer's claims against the debtor's (here Weis') estate. 15 U.S.C. § 78fff(f)(1). Touche Ross contends that SIPC's statutory right of subrogation against the debtor's estate is its exclusive remedy, precluding any rights against third parties such as Touche Ross. We disagree.
 
 
 40
 Section 78fff is a detailed blueprint for the distribution of the liquidated debtor's estate, and it is to be expected that SIPC's rights against the estate would be included in that section. However, there is no reason to believe that this was meant to destroy SIPC's general common-law right of equitable subrogation.
 
 
 41
 (T)he general rule is that upon payment of a loss the insurer is entitled to be subrogated pro tanto to any right of action which the insured may have against a third person whose negligence or wrongful act caused the loss.
 
 
 42
 31 N.Y.Jur., Insurance § 1620, at 510. See Ackerman v. Motor Vehicle Accident Indemnification Corp., 18 A.D.2d 307, 239 N.Y.S.2d 463 (1st Dept. 1963) (explicit statutory provision did not destroy MVAIC's broader common-law right to subrogation).
 
 
 43
 Moreover, we believe that it is more in keeping with the intent of Congress that wrongdoers not receive a windfall benefit from the existence of SIPC, and that SIPC be able to recoup its losses from solvent wrongdoers. Accordingly, we find that SIPC is subrogated to the right of action implied in section 17 in favor of brokers' customers against third parties such as accountants. See SEC v. Albert Maguire Securities Co., (Current) Fed.Sec.L.Rep. (CCH) P 96,129, at 92,076 (3d Cir. July 27, 1977).
 
 B
 
 44
 The Trustee contends that he is a proper plaintiff herein, both as the representative of Weis' estate and as bailee of Weis' customers' property. We hold that he may maintain this action on behalf of such customers as have not been fully reimbursed by SIPC.
 
 
 45
 The barriers to a right of action on Weis' behalf are insurmountable. It is apparent that brokers, such as Weis, were not included in the class of those Protected by section 17; indeed, brokers are the very entities Regulated by section 17.
 
 
 46
 Two recent cases in point are Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), and Lank v. New York Stock Exchange, 548 F.2d 61 (2d Cir. 1977). In each, a member of the class sought to be regulated by Congress attempted to claim the benefit of an implied right of action under the very statute that regulated it. Chris-Craft held that a defeated tender offeror could not enforce the Williams Act, 15 U.S.C. § 78O (e), against a successful tender offeror, because "a party whose . . . conduct was purposefully brought under federal control by the statute . . . can scarcely lay claim to the status of 'beneficiary' whom Congress considered in need of protection." 430 U.S. at 37, 97 S.Ct. at 947.
 
 
 47
 In Lank, we decided, in a case not unlike the instant case, that the receiver of a liquidated brokerage firm could not because the firm itself could not sue a securities exchange for failure to force the firm to comply with the exchange's rules. We pointed out that the '34 Act did not afford protection "to the very members of the stock exchanges whose conduct was being regulated." 548 F.2d at 66. The extent to which Lank parallels the instant case precludes our holding that the Trustee may maintain this action on Weis' behalf.
 
 
 48
 However, none of the above considerations apply to an action brought by the Trustee as bailee of the property of Weis' customers. He is responsible for marshalling and returning their property; to the extent that he is unable to do so, he argues, he may sue on behalf of the customer/bailors any wrongdoer whom they could sue themselves.
 
 
 49
 Rule 17(a) of the Federal Rules of Civil Procedure reads, in part: "(A) . . . bailee . . . may sue in his own name without joining with him the party for whose benefit the action is brought . . . ." The Advisory Committee Notes to this section, added in 1966,[14] point out by way of illustration that the "owner of a warehouse in which household furniture is stored is equally entitled to sue on behalf of the numerous owners of the furniture stored." 39 F.R.D. 69, 85 (1966). See generally 5 N.Y.Jur., Bailments §§ 118, 119.
 
 
 50
 To the extent that customers have claims that have not been satisfied either by Weis in liquidation, See note 6 Supra, or by SIPC, they retain rights of action against Touche Ross. We hold that the Trustee, as bailee, is an appropriate real party in interest to maintain this action on their behalf.
 
 IV
 
 51
 Since we hold that both SIPC and the Trustee may maintain this action against Touche Ross, we remand to the district court for further proceedings consistent with this opinion. We leave to it in the first instance a number of questions that will now arise: whether to stay the federal action pending determination of the state action;[15] whether to exercise pendent jurisdiction over the plaintiffs' common-law claims; and what the appropriate standard is for accountant liability in actions under section 17, Cf. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).
 
 
 52
 Reversed and remanded.
 
 TIMBERS, Circuit Judge, concurring:
 
 53
 I concur in all respects in Judge Lumbard's clear, concise and, in my view, correct majority opinion.
 
 
 54
 In view of the characteristically thoughtful and earnest dissent of our Brother Mulligan, however, I should like to add a few words, partly to supplement Judge Lumbard's opinion, but chiefly to suggest that Judge Mulligan's dissent be read in the light of the following observations.
 
 
 55
 First, in urging that customers of a broker-dealer in liquidation have no implied right of action for damages under Section 17 of the Exchange Act against accountants who prepare false or misleading reports required by that statute, the dissent understandably is disturbed by the Unanimous opinion in Cort v. Ash, 422 U.S. 66, 78 (1975), as recently reaffirmed in Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 37-45 (1977). Granted that the dissent's massive effort to distinguish or to apply a gloss to Ash is an artful attempt to circumvent this key decision, I fear that our dissenting colleague has misapprehended the essential purpose of Ash in stating certain factors to be taken into consideration in determining whether to imply a right of action under a given statute. The dissent at the outset, Post, at 628, emphasizes that Ash is not relevant to a case which arises under a statute which expressly provides for a private right of action. This overlooks the fact that the Supreme Court specifically applied the Ash analysis in Piper, supra, 430 U.S. at 37-41, in determining whether a private remedy was implicit in Section 14(e) of the same statute with which we are here concerned, i. e. the Exchange Act. Assuming that what the dissent intends to emphasize, Post, at 628, is that Ash does not apply when an Express remedy is provided for the Specific wrong complained of, it must be remembered that the Court reaffirmed the implication of a private right of action under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730 (1975), despite the absence of legislative history on the subject, Id. at 737, much less "clear contrary evidence" of legislative intent. Post, at 630.
 
 
 56
 Second, the dissent's displeasure with J. I. Case Co. v. Borak, 377 U.S. 426 (1964), likewise is understandable. This seminal opinion written by the late Mr. Justice Tom Clark for a Unanimous Supreme Court, in holding that Section 27 of the Exchange Act provided the jurisdictional underpinning for an implied private right of action for damages (as well as for declaratory and equitable relief) arising from violations of Section 14(a) of the Exchange Act, Id. at 430-35, expressly recognized that "Private enforcement of (Commission rules) provides a necessary supplement to Commission action", Id. at 432, and that "(I)t is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." Id. at 433. Despite our Brother Mulligan's herculean effort in dissent to buttress his assertion that Borak "has been significantly restricted by more recent decisions of the Supreme Court", Post, at 628, those decisions strike me as expressly and emphatically reaffirming the Borak rule[1] as Mr. Justice Stevens stated in Piper, supra, 430 U.S. at 67, "Borak remains a viable precedent."
 
 
 57
 Third, the dissent speaks disparagingly of the SEC amicus brief. Post, at 619 n. 1. As Judge Lumbard correctly points out, Ante, at 627 n. 3, we were aided materially by the SEC brief, whereas the district court did not have the advantage of knowing of the SEC's position. Here again, our Brother Mulligan's attempt to disparage the SEC brief is understandable, for it urges forcefully and cogently that SIPC should be permitted to assert a private right of action under Section 17 of the Exchange Act under the circumstances of this case. But far more basic than whether the SEC as amicus supports or opposes one side or the other in litigation under the federal securities laws, Is that the position of the SEC should be known to the court. That is the point of Judge Lumbard's observation referred to above. And it is especially important in a case of first impression such as the instant one involving a statute under which Congress has imposed on the Commission specific responsibilities.[2] Wholly aside from the instant case where I find the SEC amicus brief to measure up to the Commission's high standard of competence and fairness I do hope that our Brother Mulligan's disparagement of the SEC amicus brief will not be construed as a judicial signal, even in dissent, that the Commission should retreat to its position of a generation ago which drew sharp criticism from our Court. Compare Blau v. Mission Corp., 212 F.2d 77, 81 (2 Cir.), Cert. denied, 347 U.S. 1016 (1954), and Roberts v. Eaton, 212 F.2d 82, 84 (2 Cir.), Cert. denied, 348 U.S. 827 (1954), with Studebaker v. Gittlin, 360 F.2d 692, 695 (2 Cir. 1966), and Greene v. Dietz, 247 F.2d 689, 695-98 (2 Cir. 1957) (concurring and dissenting opinions; per curiam opinion on rehearing). See Some Practical Aspects: The SEC and The Federal Judiciary, 41 A.B.A.J. 1136, 1137-38 (1955).[3]
 
 
 58
 Accordingly, after carefully considering Judge Mulligan's dissenting opinion, especially in the light of the observations set forth above, I concur without qualification in Judge Lumbard's majority opinion.
 
 MULLIGAN, Circuit Judge (dissenting):
 
 59
 In my view this case was properly decided by Judge Wyatt and the order and judgment dismissing the complaint should be affirmed.[1] The majority announces that "(a)t least since J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) . . . it has been accepted in securities law that when a statutory provision imposes a duty on someone in favor of a class of protected persons, those persons may sue for the 'statutory tort' committed when the duty is breached." Majority opinion at 623. The Borak rule, which liberally implied private actions in federal regulatory acts on a statutory tort theory, has been significantly restricted by more recent decisions of the Supreme Court which are misapplied by the majority opinion.[2]
 
 
 60
 While the majority purports to consider the factors set forth in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), it must be emphasized that Justice Brennan in his opinion in Cort carefully restricted their application: "In determining whether a private remedy is implicit in a statute Not expressly providing one, several factors are relevant." 422 U.S. at 78, 95 S.Ct. at 2088 (emphasis supplied). In Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 37, 97 S.Ct. 926, 947, 51 L.Ed.2d 124 (1977) Chief Justice Burger's opinion similarly confined the Cort factors, noting that they are " 'relevant' in determining whether a private remedy is implicit in a statute Not expressly providing one." (Emphasis supplied).
 
 
 61
 In the instant case, however, we are confronted with a statute for which Congress has clearly provided a remedy in the event of certain violations. Admittedly, section 17(a), set forth in footnote 1 of the majority opinion, does not itself include any private remedy for an infraction of its terms. It simply requires that brokers or dealers such as Weis, make, keep and preserve records and make such reports as the SEC may prescribe by its rules and regulations in the interest of the public and for the protection of investors. Other comparable sections of the '34 Act (the Act) also provide for the filing of reports. See sections 13(a), 15 U.S.C. § 78m(a); 13(d), 15 U.S.C. § 78m(d); 13(f), 15 U.S.C. § 78m(f); and 15(a), 15 U.S.C. § 78O (d). Like section 17(a), these sections include in their text no provisions for a private remedy.
 
 
 62
 Section 17 is immediately followed, however, by section 18(a), 15 U.S.C. § 78r(a), entitled "Liability for Misleading Statements" which does provide an express private remedy for violation of the reporting provisions of the Act. It states:
 
 
 63
 Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to (the '34 Act) or any rule or regulation thereunder . . ., which statement was . . . false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have Purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading.
 
 
 64
 (Emphasis supplied).
 
 
 65
 Section 18(a) follows upon the heels of section 17. Its subject matter covers reports or documents filed pursuant to the '34 Act and regulations promulgated thereunder. Thus, Judge Wyatt correctly found and, indeed, common sense would dictate, that section 18(a) expressly provides the sole private remedy which Congress intended to be available for a violation of section 17(a) and the other reporting sections of the '34 Act. Furthermore, most courts which have considered the issue have found section 18(a) to contain the only remedy for violation of the Act's reporting sections.[3]
 
 
 66
 It seems clear, then, that the statutory scheme enacted by Congress provides in section 18(a) an express but limited remedy for violations of section 17(a). As noted above, the Supreme Court has repeatedly limited use of the Cort factors to instances in which No statutory remedy whatsoever has been provided. Hence, it must seriously be questioned whether the Cort factors are even the appropriate analytical tool to determine whether an implied private right of action should exist for infractions of section 17(a). Nonetheless, using a Cort analysis the majority finds an implied private damage remedy because it determines that brokers' customers are "favored wards" of, and a class "peculiarly protected" by section 17. Therefore, states the majority, we cannot assume that the Congress intended to deprive them of "the means of protection." Majority opinion at 623.
 
 
 67
 I believe the majority reasoning is faulty in two major respects. In the first place, if the brokers' customers were so clearly the concern of the Congress when it enacted section 17(a), its failure to afford them a private damage remedy in section 18(a), which was contemporaneously enacted and which provides a private remedy for misleading statements in reports filed pursuant to the mandate of the Act, leads to the conclusion that Congress did not intend a private damage remedy to be available to brokers' customers.
 
 
 68
 The principle of statutory construction by which one reaches this result is somewhat forbiddingly known as "Expressio unius est exclusio alterius ". This maxim was recently emphasized and applied by the Supreme Court in National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) (Amtrak ). There the Court held that the plaintiff association of railroad passengers had no implied cause of action as primary beneficiaries of the Rail Passenger Service Act of 1970 since that Act expressly provided for enforcement by the Justice Department. In its opinion, the Court observed:
 
 
 69
 A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies. "When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." . . . This principle of statutory construction reflects an ancient maxim Expressio unius est exclusio alterius. Since the Act creates . . . a private cause of action only under very limited circumstances, this maxim would clearly compel the conclusion that the remedies created in § 307(a) are the exclusive means to enforce the duties and obligations imposed by the Act.
 
 
 70
 414 U.S. at 458, 94 S.Ct. at 693.
 
 
 71
 Soon after its decision in Amtrak the Supreme Court reaffirmed its reliance on the Expressio unius principle in Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 418-19, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). In finding that the express statutory grant to the SEC of a right to seek injunctive relief to enforce duties under the Securities Investor Protection Act precluded an implied right in others to seek similar relief, the Court reiterated its observation in Amtrak that "express statutory provision for one form of proceeding ordinarily implies that no other means of enforcement was intended by the Legislature." Id. at 419, 95 S.Ct. at 1738.
 
 
 72
 Similarly, in the instant case the provision by Congress in section 18(a) of a narrow private cause of action for section 17(a) infractions militates strongly against our attributing to Congress a willingness to allow more expansive enforcement of the duties and obligations created by that section. Moreover, while the Court in Amtrak acknowledged that the Expressio unius principle must "yield to clear contrary evidence of legislative intent," 414 U.S. at 458, 94 S.Ct. at 693, the majority here concedes that it finds nothing in the language or legislative history of section 17(a) to indicate that Congress intended to create a private cause of action under that section. In my view appellants have failed to demonstrate the "clear contrary evidence" to rebut the conclusion that the limited express right of action under section 18(a) is the exclusive remedy for a breach of section 17(a).[4]
 
 
 73
 We find further support for the position that there is no private right of action implied under section 17(a) in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). There the Court commented: "When Congress wished to provide a remedy (under the '34 Act) to those who neither purchase nor sell securities, it had little trouble in doing so expressly" 421 U.S. at 734, 95 S.Ct. at 1925. Judge Wyatt's opinion below reviews several such sections of the '34 Act which impose liability on persons other than purchasers or sellers. 428 F.Supp. at 490. The presence of these provisions in the '34 Act reinforces the conclusion that the framing of the section 18(a) remedy in terms of purchasers and sellers of securities to the exclusion of customers of broker-dealers was an intentional congressional limitation on the class for whom a private action would be available in the event of a section 17(a) violation.
 
 
 74
 The Supreme Court in Blue Chip also addressed itself specifically to section 18:
 
 
 75
 Section 18 of the 1934 Act, prohibiting false or misleading statements in reports or other documents required to be filed by the 1934 Act, limits the express remedy provided for its violation to "any person . . . who . . . shall have purchased or sold a security at a price which was affected by such statement. . . . It would indeed be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action.
 
 
 76
 421 U.S. at 736, 95 S.Ct. at 1925.
 
 
 77
 But that is precisely what the majority is imputing to Congress in this case. The misleading reports which create the basis for the claim here made were required to be filed by section 17(a) of the '34 Act and the remedy provided by section 18(a) concededly encompasses not broker-dealer customers but only securities purchasers or sellers.[5] I find that Amtrak, Barbour and Blue Chip compel the conclusion that the omission was studied and that the implication of a damage action against accountants under this section is totally unwarranted. The majority cannot properly characterize this as a case where there is no explicit private remedy provided by Congress. Rather, it is a case in which the remedy provided was designed to exclude the class which is here seeking monetary relief. Thus, the majority's holding in my view goes beyond statutory construction; it amounts instead to judicial legislation.
 
 II
 
 78
 The second flaw in the majority opinion is the failure to consider the impact of Piper v. Chris-Craft Industries, Inc. supra, in its discussion of the Cort factors. In Piper the Court, while again carefully limiting its holding to cases where the statute to be construed provides no private remedy, id. 430 U.S., at 24-25, 97 S.Ct. 926, emphasized that private relief will be implied in favor of a particular class intended to be protected by the statute only when it is " 'necessary' " to effectuate Congress' goals. 430 U.S. at 25, 97 S.Ct. 926.[6] The inquiry called for is to ascertain the congressional purpose and to determine whether a private damage action by brokers' customers is a Necessary adjunct, id., to accomplish the primary congressional goal embodied by the legislation. Cort v. Ash; supra, 422 U.S. at 84, 95 S.Ct. 2080.
 
 
 79
 The plain language of section 17 establishes the congressional concern that the SEC be kept on notice of the financial health and stability of registered broker-dealers through whom public investors purchase and sell securities.
 
 
 80
 The SEC itself has long recognized that the primary protection for brokers' customers lies in preventive monitoring: "customers do not open accounts with a broker relying on suit, judgment and execution to collect their claim they are opened in the belief that a customer can, on reasonable demand, liquidate his cash or securities position." Guy D. Marianette, 11 SEC 967, 971 (1942). Hence, the broker-dealer is required to file reports which are subject to such examination as the SEC may deem necessary or appropriate in the public interest or for the protection of investors. As the majority points out, a principal and, in fact, dominant method of investor protection is the net capital rule. Section 15(c)(3) of the '34 Act, 15 U.S.C. § 78O (c)(3), authorizes the SEC to provide safeguards with respect to the financial responsibility of broker-dealers including their "acceptance of custody and use of customers' securities, and the carrying and use of customers' deposits or credit balances." Pursuant to Rule 15c(3)(1)(b)(2), 17 C.F.R. § 240.15c3-1(b)(2), the SEC exempts broker-dealers who are members in good standing of the New York Stock Exchange (as was Weis) from compliance with SEC net capital requirements. This is because such broker-dealers are subject to Exchange Rule 325, which is deemed by the Commission to impose requirements more comprehensive than the requirements of the SEC. Id. Under Rule 325 Weis was required to maintain a minimum prescribed ratio of aggregate indebtedness to net capital. Compliance by broker-dealers with the net capital rule is ensured by the filing of reports and monitoring by SEC as well as by the Exchange, which is authorized to enforce its regulations, see 15 U.S.C. § 78f and which, according to the SEC brief submitted on this appeal, makes annual examinations of each of its broker-dealer members to this end.
 
 
 81
 Congressional concern for the solvency of broker-dealers was not limited to the reporting and monitoring requirements of section 17. Following the boom of the 1960's a number of brokerage firms experienced financial instability and even failure. Securities Investor Protection Corp. v. Barbour, supra, 421 U.S. at 415, 95 S.Ct. 1733. The response of Congress was the enactment in 1970 of the Securities Investor Protection Act (SIPA), 15 U.S.C. § 78aaa Et seq. as an amendment to the '34 Act. Under SIPA Congress created the Securities Investor Protection Corporation (SIPC), the function of which extends well beyond providing protection to investors upon the liquidation of their brokers. As the Court noted in Securities Investor Protection Corp. v. Barbour, supra, at 421, 95 S.Ct. at 1739:
 
 
 82
 The SIPC properly treats an application for the appointment of a receiver and liquidation of a brokerage firm as a last resort. It maintains an early-warning system and monitors the affairs of any firm that it is given reason to believe may be in danger of failure.
 
 
 83
 The SEC too has noted that the primary purpose of the net capital requirements for broker-dealers is to give "the (SEC), self-regulators and SIPC sufficient early warning to take appropriate action to protect customers prior to the time . . . of liquidation." 1934 Act Release No. 11497, June 26, 1975 (1975-76 Transfer Binder), CCH Fed.Sec.L.Rep. P 80,212.
 
 
 84
 The majority here finds that since section 18(a) leaves broker-dealer customers without protection and since brokers' customers are the "favored wards" of section 17, it cannot agree that Congress simultaneously sought to protect them and to deprive the class of the means of protection. However, a review of section 17(a) and the rules promulgated by the SEC as well as the creation of SIPC, demonstrates that the means Congress employed to ensure solvency of broker-dealers were to require the keeping and filing of records, the maintenance of certain net capital balances and the oversight of the SEC, SIPC and the Exchanges. Thus, the primary congressional intent obviously has been to provide a system of reports and monitoring which would Prevent insolvency of broker-dealers; not to create private law suits for damages After insolvency has occurred.[7]
 
 
 85
 Since the filing requirements of section 17(a) are designed to give early warning, the importance to this scheme of implying a damage remedy After liquidation is dubious. Congress made no suggestion either in 1934 or in 1970, when it enacted SIPA, that a private damage action was a Necessary corollary of the section 17(a) reporting provisions. The threat of liquidation under SIPA as well as the criminal sanctions available for violations of section 17(a) certainly present a greater deterrent than private damage actions.[8] As the Supreme Court noted in Piper, "Nor can we agree that an ever-present threat of damages (beyond available injunctive relief) . . . will provide significant additional protection . . . . The deterrent value, if any, of such awards can never be ascertained with precision." 430 U.S. at 39-40, 97 S.Ct. at 948.
 
 
 86
 Even more importantly, to the extent that a threat of private damage actions might further induce compliance with the reporting scheme of section 17 the majority has discounted the effect of available state law remedies, which arise not from state securities law protection of brokers' customers, but from well established tort law principles.[9] See, e. g., Restatement 2d of Torts §§ 531, 552 (1977). Common law actions for damages against accountants have long been recognized. See, e. g., Note, Accountants' Liabilities For False and Misleading Financial Statements, 67 Colum.L.Rev. 1437 (1967). Where, as in the instant case, fraud is arguably alleged, it is important to note that should the actionable elements of fraud be provable, the states have universally permitted recovery to third parties who relied on the misrepresentations. Anno.: Liability of Public Accountant to Third Parties, 46 A.L.R.3d 979, 982-83 (1972). While the state law treatment of actions based only on an accountant's negligence has not been so uniform, id. at 982, the trend in state law, based on generally recognized tort principles, has been to expand the accountant's liability for negligence to those clearly definable classes of third parties who the accountant knew would rely on the statements in question. See, e. g., White v. Guarente, 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977); Restatements 2d of Torts § 552 (1977). In fact, should scienter be held a required element of the action found implied by the majority in section 17,[10] see Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), it may well be that a state law action would provide a broader basis for accountant liability than the federal action implied here under the '34 Act.
 
 
 87
 In any event, the very existence of these state law remedies supplies that threat of liability which the majority essentially is seeking in order to promote adherence to the requirements under section 17(a). Thus, the majority wrongly dismisses the significance of available state law remedies on the ground that the standard of liability for private damage actions in connection with 17(a) violations must be national in scope. Since, as demonstrated above, the Primary congressional purpose underlying the section 17 reporting scheme is prophylactic, uniformity of standards for actions brought to recover losses After the brokerage firm has failed simply is not Necessary to achieving the primary goals of that statute. See Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477-78, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).
 
 
 88
 The SEC has also argued, and the majority has accepted the position, that private damage actions are a necessary supplement to commission action because the SEC does not have the resources to audit the financial statements submitted under section 17(a). Whatever force this argument might once have had, see J. I. Case Co. v. Borak, supra, 377 U.S. at 432, 84 S.Ct. 1555, is seriously undermined by the Court's observation in Piper that "institutional limitations alone do not lead to the conclusion that any party . . . should have a cause of action for damages." 430 U.S. at 41, 97 S.Ct. at 949. The argument that a regulatory agency is confessedly unable properly to regulate broker-dealers as charged by Congress and detailed by its own regulations, and that therefore the federal courts should find a damage remedy implicit in an act which studiously avoided giving one to the class sought to be represented here, is simply unpersuasive.[11]
 
 
 89
 In sum, I conclude that since section 18(a) of the Act does provide a damage remedy for the filing of misleading statements in section 17(a) reports, and since this remedy excludes from its coverage the customers of broker-dealers, the Cort factors employed by the majority afford an inappropriate analytical framework for this case. Instead, under the reasoning of Amtrak and Barbour it is apparent that by limiting actions under section 18(a) to purchasers and sellers of securities Congress expressed its intent to deny recovery for section 17(a) violations to a broader class of plaintiffs. Nor have the appellants here adduced the strong contrary evidence of legislative intent regarding section 17(a) which would lead me to reach the conclusion, embraced by the majority, that implication of such a remedy is consistent with the legislative scheme. Moreover, even if the Cort factors were the proper mode of analysis in this case, they must be applied in conjunction with the gloss of Piper. Yet there is no showing here that a private damage remedy against accountants is Necessary to vindicate the primary congressional purpose embodied in section 17(a). As Judge Medina observed in Lank v. New York Stock Exchange, 548 F.2d 61, 65 (2d Cir. 1977) where we refused to imply a private remedy in favor of the receiver of an insolvent broker-dealer against the Exchange: "Even were we to agree . . . that granting him a right of action against the Exchange would 'accord' with the purpose of the (1934) Act, our function here is to discern the intent of Congress, not to legislate in its place."
 
 III
 
 90
 Having found no implied cause of action arising under section 17(a) in favor of customers of broker-dealers, I could of course find no derivative rights in either SIPC or the trustee. However, I also contest the holding that appellants are proper parties to maintain the action found by the majority to be implied in section 17(a). The majority has properly held that neither the trustee nor SIPC in its own right can bring any action under section 17(a) of the '34 Act. Neither can claim to be an intended beneficiary of that act since both are the creatures of SIPA, enacted in 1970. Nor is either appellant a public investor. Lank v. New York Stock Exchange, supra, 548 F.2d at 64-66 is dispositive of this issue.
 
 
 91
 Yet while denying to SIPC the right to bring a section 17(a) action on its own behalf, the majority also transmutes that entity into a subrogee clothed with the power in that capacity to bring a private damage action under 17(a) (an action itself now implied by the majority for the first time in the forty-four years section 17 has been on the books). By what alchemy a congressionally created corporation with limited powers to litigate, see Securities Investor Protection Corp. v. Barbour, supra, can now sue in a federal court for an alleged violation of section 17(a) of the '34 Act, is not made clear. When Congress created SIPC, its express but limited rights of subrogation were spelled out in SIPA: "To the extent that moneys are advanced by SIPC to the trustee to pay the claims of customers, SIPC shall be subrogated to the claims of such customers with the rights and priorities provided in this section." 15 U.S.C. § 78fff(f)(1). As the majority recognizes, those claims to which SIPC is subrogated by statute are clearly against the debtor's estate only and no rights against the accountant flow therefrom. Since Congress has delineated the subrogation rights of SIPC, its failure to provide for subrogation against any third party would clearly dictate that none exist under the previously discussed principle: Expressio unius est exclusio alterius. Rogers v. National Surety Co., 116 Neb. 170, 216 N.W. 182 (1927). The effect of the majority's extension of SIPC's subrogation rights is to circumvent the intent of Congress by ignoring the directive of SIPA that SIPC be subrogated "With the rights and priorities provided in this section." 15 U.S.C. § 78fff(f)(1) (emphasis supplied).
 
 
 92
 Similarly, the Trustee, held by the majority to have no direct cause of action under section 17(a), is nonetheless found to have such capacity in his role as a bailee. The majority finds that his responsibility to marshal and return property to the customers of the debtor broker-dealer authorizes him to bring this action. But that responsibility of the Trustee is created by SIPA, 15 U.S.C. § 78fff(a)(1), and is inherent in his Trustee function, see also 15 U.S.C. § 78fff(b)(1). Having rejected his right to sue as a Trustee of Weis under Lank v. New York Stock Exchange, supra, I fail to see how denominating him a bailee adds a jot or a tittle to his statutorily created status as the representative of Weis an entity regulated by, and precluded from suing under, the Act. Furthermore, the customers on whose behalf the Trustee seeks to maintain suit are not only entitled to bring, but have already initiated their own action against Touche Ross. See notes, 3, 9, Supra. The SEC understandably has expressed no view on this point.
 
 
 93
 For these reasons I respectfully dissent and would affirm Judge Wyatt's decision below.
 
 
 
 [1]
 15 U.S.C. § 78q (1976). This section was amended in 1975; in 1972, the date relevant to the instant case, it read, in relevant part:
 (a) Every national securities exchange, every member thereof, every broker or dealer who transacts a business in securities through the medium of any such member, every registered securities association, and every broker or dealer registered pursuant to section 15 of this title, shall make, keep, and preserve for such periods, such accounts, correspondence, memoranda, papers, books, and other records, and make such reports, as the Commission by its rules and regulations may prescribe as necessary or appropriate in the public interest or for the protection of investors. Such accounts, correspondence, memoranda, papers, books, and other records shall be subject at any time or from time to time to such reasonable periodic, special, or other examinations by examiners or other representatives of the Commission as the Commission may deem necessary or appropriate in the public interest or for the protection of investors.
 
 
 [2]
 SIPC was created by the securities Investor Protection Act of 1970, Pub.L. No. 91-598, 91st Cong., 2d Sess., 84 Stat. 1636, Codified at 15 U.S.C. §§ 78aaa-78Lll (1976)
 
 
 [3]
 Our decision in this case has been materially aided by the brief Amicus curiae submitted on appeal by the SEC. Judge Wyatt did not have the advantage of the SEC's position in this matter
 Judge Wyatt also dismissed, for lack of subject matter jurisdiction, five state common-law claims which the Trustee had sought to bring under principles of plenary bankruptcy or pendent jurisdiction, and four state common-law claims by SIPC, with respect to which diversity of citizenship had been alleged. Judge Wyatt ruled that SIPC was not a District of Columbia corporation for purposes of jurisdiction, and that complete diversity did not exist. Because of the view we take of the case, we need express no opinion as to the scope of bankruptcy jurisdiction in SIPA-receivership cases, nor as to the citizenship of SIPC.
 
 
 [4]
 In this posture of the case, we take as we must that view of the facts most favorable to plaintiffs, treating as true the allegations of the complaint. See Escalera v. New York Housing Auth., 425 F.2d 853, 857 (2d Cir. 1970)
 
 
 [5]
 Plaintiffs contend that the misleading statements certified by Touche Ross were the direct cause of the failure to take any remedial action, such as an infusion of capital or merger with another firm. Thus, they assert, Touche Ross' dereliction substantially contributed to Weis' forced liquidation and plaintiffs' losses. These contentions will be discussed more thoroughly in the body of the opinion
 
 
 [6]
 Property on hand when Weis was liquidated permitted the Trustee to return to customers 67% of the property they should have received. In addition, SIPC paid out some $14 million to customers and other creditors. Since under 15 U.S.C. § 78fff (1976), accounts are protected only up to $20,000 in cash and $50,000 in cash and securities, there may remain customers with uncompensated losses, who therefore retain claims against those who caused their losses. It is these claims that we hold the Trustee may assert. See part III B Infra
 
 
 [7]
 Plaintiffs aver that the state court action was commenced first only in a highly technical sense. It was begun by service of a summons without complaint (the complaint was not served until after the filing of the federal complaint), and then apparently ignored for some months by mutual consent. The parties agree that the state suit has progressed to the extent of responses by each plaintiff to one set of defendant's interrogatories
 
 
 [8]
 For a discussion of the functions and duties of accountants in this context, see In re Touche, Niven, Bailey & Smart, 37 S.E.C. 629, 5 Fed.Sec.L.Rep. (CCH P 72,100, at 62,212 (1957); Note, Accountants' Liability for False and Misleading Financial Statements, 67 Colum.L.Rev. 1473 (1967)
 
 
 [9]
 In 1957, when the SEC expanded certification requirements for section 17 reports,
 that step represented the Commission's considered view that certification and reporting requirements constituted a valuable regulatory tool for the protection of a customer in respect of the risks involved in leaving his money and securities with his broker-dealer.
 SEC, Study of Unsafe and Unsound Practices of Brokers and Dealers, H.Doc.No. 92-231, 92d Cong., 1st Sess., at 24 (1971).
 
 
 [10]
 Citations to rule 17a-5 are to 17 C.F.R. § 240.17a-5 as it existed in 1972. Rule 17a-5(j)-(o) were adopted on June 30, 1972, and appear in the Federal Register for July 21, 1972
 
 
 [11]
 To the extent that the court below relied on the remedy created by section 18 of the '34 Act as evidence of a legislative intent to deny a private remedy for violations of section 17, its concerns will be treated in part II B Infra
 
 
 [12]
 In its Amicus brief, the SEC advises us that, in fiscal 1976, over 5000 brokers and dealers were registered with it; that each of the approximately 750 broker-dealers that are not members of self-regulating organizations must be audited annually, as must the 500 or so against whom complaints are lodged; and that this leaves the SEC able to examine each year the statements of only 5% Of broker-dealers who are apparently untroubled members of self-regulatory organizations
 
 
 [13]
 We need not reach the question whether SIPC could ever have a claim for damages other than on behalf of a broker's customers; we note only that as the creature of a 1970 statute, SIPC can hardly claim to have been a specially protected beneficiary of the '34 Act. SIPC makes much of 15 U.S.C. § 78bbb (1976), which treats SIPA as if it "constituted an amendment to, and was included as a section of" the '34 Act. Nonetheless, it is indisputable that SIPC is not the kind of entity Congress sought to protect either in 1934 or in 1970; the cited portion of the 1970 statute appears to do no more than indicate that, except where specifically provided otherwise, any remedy created by SIPA is supplemental to the preexisting remedies of the '34 Act
 
 
 [14]
 The purpose of the 1966 amendment was "(to) add to the illustrative list of real parties in interest a bailee meaning, of course, a bailee suing on behalf of the bailor with respect to the property bailed." 39 F.R.D. 69, 84 (1966)
 
 
 [15]
 In Weiner v. Shearson, Hammill & Co., 521 F.2d 817 (9th Cir. 1975), the court of appeals chose to remand the question of a stay to the district court, despite its thorough discussion of the factors involved in the determination of the question
 
 
 [1]
 For example, in Piper, supra, 430 U.S. at 25, Chief Justice Burger stated:
 "This Court has nonetheless held that in some circumstances a private cause of action can be implied with respect to the 1934 Act's antifraud provisions, even though the relevant provisions are silent as to remedies. J. I. Case Co. v. Borak, 377 U.S. 426 (1964) (§ 14(a)); Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 13 n. 9 (1971) (§ 10(b))."
 In SIPC v. Barbour, 421 U.S. 412, 423 (1975), referring to Borak, Mr. Justice Marshall summarized its holding:
 "In light of the 'broad remedial purposes' of the Act and the SEC's representation that private enforcement was necessary to effectuate those purposes, the Court held that the action for damages could be maintained."
 And in Blue Chip Stamps, supra, 421 U.S. at 730, after summarizing the 25 year development of the decisional law that there is an implied private right of action under Rule 10b-5, Mr. Justice Rehnquist referred to Borak as follows:
 "Such a conclusion was, of course, entirely consistent with the Court's recognition in J. I. Case Co. v. Borak, 377 U.S. 426, 432 (1964), that private enforcement of Commission rules may '(provide) a necessary supplement to Commission action.' "
 These decisions do not strike me as significantly "restricting" Borak ; rather, they seem quite clearly to reaffirm Borak as a "viable precedent", each case turning of course on the particular statute or rule under consideration.
 
 
 [2]
 Section 7 of SIPA, 15 U.S.C. § 78ggg (1976). See SIPC v. Barbour, supra, 421 U.S. at 417
 The SEC cogently summarizes in its brief filed in our Court its interest in the instant appeal as follows:
 "The Commission respectfully submits this brief as Amicus curiae because this appeal raises significant issues which could materially affect its administration of the federal securities laws. We believe . . . that permitting a private right of action under Section 17 of the Securities Exchange Act will provide a necessary supplement to the Commission's efforts to enforce that section and the rules and regulations thereunder. In addition, financial statements submitted by broker-dealers pursuant to the Act play a key role in the Commission's administration and enforcement of various statutory provisions designed to protect against loss of the funds and securities of customers of broker-dealers and to maintain confidence in the securities markets at a high level. The availability of a right of action under Section 17 will thus have a direct bearing on the overall effectiveness of such statutory and regulatory provisions as those regarding hypothecation and segregation of securities and cash, and the net capital rule, designed to ensure the ability of brokers to meet their financial obligations as custodians of customer property. In addition, the Commission has 'plenary authority' with respect to the operations of the Securities Investor Protection Corporation, and is therefore concerned that SIPC have the ability to recover funds needlessly expended due to the wrongful acts of others, thus preserving the funds available to compensate losses suffered by the customers of brokers." (footnotes omitted). SEC Amicus Curiae Brief, filed August 31, 1977, at 3-4.
 
 
 [3]
 I am pleased to note that, in response to my concurring opinion, Judge Mulligan very commendably has disclaimed any intention to disparage the SEC amicus brief. Post, at 627-28 n. 1, last paragraph. This reflects the good judgment and fairness for which our distinguished colleague is well known. I think that Judge Mulligan, as a former Dean of the Fordham Law School, would join in taking judicial notice of one of the leading expositions of the history and functions of the amicus curiae through centuries of development of the law. Beckwith and Sobernheim, Amicus Curiae MINISTER OF JUSTICE, 17 Fordham L.Rev. 38 (1948)
 
 
 [1]
 The majority comments in footnote 3 that its decision has been materially aided by the brief Amicus curiae submitted on appeal by the SEC and that Judge Wyatt did not have the advantage of the SEC's position in this matter. The Supreme Court, however, in Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 41 n. 27, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (1977) observed that ". . . its (the SEC's) 'expertise' in the securities-law field is of limited value when the narrow legal issue is one peculiarly reserved for judicial resolution, namely whether a cause of action should be implied by judicial interpretation in favor of a particular class of litigants." That, of course, is the principal issue in this case as well. It should also be added that a substantial part of the SEC brief is devoted to the argument that SIPC in its own right may assert a private right of action for violations of section 17 of the '34 Act. This proposition was not only rejected below but was repudiated by the majority in its footnote 13
 I do not "disparage", as my Brother Timbers would have it, the brief of the SEC. I simply do not agree with it neither does the majority, at least to the extent I have indicated. Nor do I dispute the propriety of its submission. I cannot believe that disagreement with the opinions of any agency can sensibly discourage the filing of a brief expressing its views as Amicus curiae (sed non parens curiae). It remains the function of the bench to construe the law as best it can even though that involves on occasion disagreement with one's colleagues or even an agency.
 
 
 [2]
 These decisions discussed in the text, Infra, include Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) (Amtrak ); see Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Numerous commentators have acknowledged the substantial retreat from Borak represented by these subsequent Supreme Court rulings. E. g., Climan, Civil Liability Under the Credit-Regulation Provisions of the Securities Exchange Act of 1934, 63 Cornell L.Rev. 206, 261-69 (1978); Comment, Implying Private Causes of Action From Federal Statutes: Amtrak and Cort Apply the Brakes, 17 B.C.Ind. & Com.L.Rev. 53, 64 (1975); Comment, Private Rights of Action Under Amtrak and Ash : Some Implications for Implication, 123 U.Pa.L.Rev. 1392, 1416 (1975); Note, Implication of Private Actions from Federal Statutes: From Borak to Ash, 1 J.Corp.Law 371 (1976); 30 Vand.L.Rev. 905, 908-10 (1977)
 
 
 [3]
 Meer v. United Brands Co., (1976-77 Transfer Binder) CCH Fed.Sec.L.Rep. P 95,648 at p. 90,213 (S.D.N.Y.1976); DuPont v. Wyly, 61 F.R.D. 615, 628 (D.Del.1973); In re Penn Central Securities Litigation, 347 F.Supp. 1327, 1340 (E.D.Pa.1972), relevant point adhered to on reargument, 357 F.Supp. 869 (E.D.Pa.1973), aff'd, 494 F.2d 528, 539-40 (3d Cir. 1974); see Myers v. American Leisure Time Enterprises, Inc., 402 F.Supp. 213, 214 (S.D.N.Y.1975), aff'd without opinion, 538 F.2d 312 (2d Cir. 1976). But see the district court cases discussed in In re Penn Central Securities Litigation, supra, 494 F.2d at 540 n. 18
 It should be noted that in a case related to that at bar the customers of Weis brought a class action against Touche Ross alleging, Inter alia, that Touche Ross' certification of the same financial statements involved here was in violation of Rule 17a-5, 17 C.F.R. § 240.17a-5 and gave the customers a cause of action under section 18(a). Rich v. Touche Ross & Co., 415 F.Supp. 95, 101-02 (S.D.N.Y.1976). Judge Brieant dismissed the complaint, finding that since the plaintiffs did not meet the purchaser-seller requirements of 18(a) they stated no claim for the alleged violation of Rule 17a-5. Id. at 102-04.
 
 
 [4]
 I do not overlook Judge Timbers' recent opinion in Abrahamson v. Fleschner, 568 F.2d 862 (2d Cir. 1977), petition for cert. filed, 46 U.S.L.W. 3588 (U.S. March 21, 1978) (No. 77-1279), which the majority cites to distinguish Amtrak and Barbour on the ground that those cases did not involve implication of private actions under the securities acts. It is important to note that in Abrahamson, where the court found a private right of action for damages implied for violations of section 206 of the Investment Advisers Act, 15 U.S.C. § 80b-6, Judge Timbers, in his opinion for the majority, repeatedly stressed that the Investment Advisers Act made Absolutely no provision for express private actions. Id. at 872, 874, 875. The opinion in Abrahamson contrasts this omission to those other securities acts which contain "sections Expressly granting injured parties a private action for damages." Id. at 874 (emphasis in original); see Piper v. Chris-Craft Industries, Inc., supra, 430 U.S., at 24-25, 97 S.Ct. 926. Indeed, in this connection the opinion then refers specifically to section 18 of the '34 Act. Id. at 874 n. 20. Judge Timbers concluded: "Had Congress provided explicitly for private damage actions it would be unnecessary to consider whether the remedy should be judicially implied." Id. at 875. This conclusion in Abrahamson is in fact strongly supportive of the analysis in this dissent
 
 
 [5]
 It should be noted that in another suit arising out of the Weis debacle Judge Wyatt has sustained a section 18(a) claim asserted by a plaintiff bank which allegedly purchased securities of Weis in reliance on the section 17(a) reports involved in this case. Exchange National Bank v. Touche Ross & Co., 75 Civ. 916 (S.D.N.Y.)
 
 
 [6]
 The underscoring of the element of necessity three times in the Piper opinion, 430 U.S. at 25, 97 S.Ct. 926, indicates the emphasis the Court wished to bring to this factor in determining whether a private remedy should be implied. Piper, therefore, is not simply a restatement or affirmation of Cort but adds a significant gloss. Wilson v. First Houston Investment Corp., 566 F.2d 1235, 1239, 1240 (5th Cir. 1978)
 
 
 [7]
 In fact SIPC's preventive measures have been quite successful. The vast majority of firms brought to SIPC's attention have been deterred from the necessity of undergoing a SIPC liquidation through a variety of tactics including mergers and withdrawal from the business of carrying customer accounts. See Securities Investor Protection Corp. v. Barbour, supra, 421 U.S., at 421 n. 4, 95 S.Ct. 1733
 
 
 [8]
 For example, in the instant situation the SEC initiated an action for injunctive relief against Weis and its officers. SEC v. Weis Securities, Inc., 73 Civ. 2332 (S.D.N.Y.). A number of Weis' principals were also convicted of a criminal conspiracy to falsify Weis' books of account. See Rich v. Touche Ross & Co., supra, 415 F.Supp. at 101
 
 
 [9]
 The same cannot be said of the appellants herein. In addition to the state law class action against Touche Ross which has been filed by Weis' customers in the Supreme Court of New York County, see Rich v. Touche Ross & Co., supra, 415 F.Supp. at 104, the appellants have initiated a state law action based on the same common law claims set forth in their complaint in this federal action. Redington v. Touche Ross & Co., No. 1399 6/76 (Sup.Ct.N.Y.Co.)
 
 
 [10]
 The point was reached neither by the majority here nor by Judge Wyatt below
 
 
 [11]
 The problem faced by the SEC in Borak of examining proxy statements under demanding time limitations (10 days or even 2 days, 17 C.F.R. §§ 240.14a-6(a), (b)), as pointed out by Judge Wyatt, 428 F.Supp. at 491, is not encountered here. Moreover, the SEC itself has stated that its burdens in this connection are lightened by the Exchange, which makes annual examinations of net capital statements by its members